UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

LAWRENCE WOODS,

                Petitioner,              Case No. 1:07-cv-1259

v.                                     Honorable Janet T. Neff

KENNETH McKEE,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.

§ 2254. Petitioner is serving a term of 15 to 66 years, imposed by the Berrien County Circuit Court

on September 30, 2005, after a jury convicted Petitioner, as a third felony offender, MICH. COMP.

LAWS § 769.11, of kidnaping, MICH. COMP. LAWS § 750.349. In his *pro se* petition, Petitioner raises

four grounds for relief, as follows:

    I.      THE DEFENDANT'S CONVICTION SHOULD BE OVERTURNED
           BECAUSE THERE WAS INSUFFICIENT EVIDENCE AT TRIAL TO
           PROVE THE DEFENDANT GUILTY OF THE CRIME.

    II.     THE TRIAL COURT DENIED THE DEFENDANT A FAIR TRIAL AND
           HIS DUE PROCESS RIGHTS BY: FAILING TO ENSURE THAT THE
           DEFENDANT HAD A FAIR TRIAL; FAILING TO GRANT THE MOTION
           FOR DIRECTED VERDICT; MAKING VARIOUS ERRONEOUS
           EVIDENTIARY RULINGS; FAILING TO GIVE PROPER
           INSTRUCTIONS; AND A FAILURE TO CONTROL THE PROSECUTOR.

    III.    THE PROSECUTOR'S ACTIONS DENIED THE DEFENDANT A FAIR
           TRIAL AND HIS DUE PROCESS RIGHTS UNDER THE MICHIGAN
           AND FEDERAL CONSTITUTIONS.

IV.     INEFFECTIVE ASSISTANCE OF COUNSEL.

Respondent has filed an answer to the petition (docket #9) stating that the grounds should be denied because they are noncognizable state-law claims or have no merit.  Upon review and applying the AEDPA standards, I find that Petitioner's grounds are either noncognizable or without merit.  Accordingly, I recommend that the petition be denied.

## **Procedural History**

### **A.     Trial Court Proceedings**

The state prosecution arose from the kidnaping of Brandi Coder on July 10, 2005.  Petitioner originally was charged with one count of extortion.  The prosecution's theory was that Petitioner blamed Coder for the loss of $1,000 worth of crack cocaine, and that he abducted her in an effort to collect the supposed drug debt.  Following a preliminary examination on July 19, 2005, the court dismissed the extortion charge but bound Petitioner over on a supplemental charge of kidnaping.  (Prelim. Exam. Tr., 69-72, docket #11.)  A supplemental information also was filed charging Petitioner as a habitual offender, third offense.

Petitioner was tried before a jury beginning September 28, 2005, and concluding on September 30, 2005.[1]  The testimony at trial is summarized below.

The victim, Brandi Coder, testified that she had known Petitioner through someone else for three or four years at the time of trial.  She was not a friend and did not regularly see him.  (Tr. I, 170.)  She knew him by his name, as well as the nicknames "City" and "Big City."  (Tr. I, 171.)  Coder was friends with Marla Underwood and her husband Mike.  (Tr. I, 171.)  She had been

---

[1]The transcripts for the three trial dates, September 28, 29, and 30, 2005, will hereafter be referenced as "Tr. I, __," "Tr. II, __," and "Tr. III, __," respectively.

close friends with Yaearla and Virsarah (or Sarah) Davis for 17 years, and she was close to their mother, Ms. Tremell, as she had lived with them at one time. (Tr. I, 172-73.)

Before midnight on July 9, 2005, Coder was with Yaearla at Mike and Marla Underwood's house. They were at the Underwood's house for about 45 minutes, leaving before midnight. When Yaearla got in the car, she was carrying what looked like a hairspray bottle and something small and square, which Coder assumed was another hair product. (Tr. I, 176-77; Tr. II, 22-23.) Yaearla set the items on the floor of the front passenger compartment. (Tr. I, 176-77.) Coder drove Yaearla to the store, where Yaearla bought a bottle of beer, and then took her home. (Tr. I, 175, 178.) Coder and her daughter went home and went to bed. (Tr. I, 182.)

The next day, while Coder was at her mother's house, she received a call from Yaearla, who wanted Coder to check if there was anything left underneath the front passenger seat. (Tr. I, 183.) Coder looked, but she found nothing. Yaearla said, "I'm screwed, I just messed up." (Tr. I, 184.) Yaearla called again five minutes later and told Coder to call Sarah to see if she had mistakenly picked up something from the car the previous night. (Tr. I, 184.) Coder did so, but did not locate anything. (Tr. I, 185.) When Coder told Yaearla that Sarah did not have it, Yaearla said she was going to start walking to her mother's house and she asked if Coder would pick her up. (Tr. I, 185.) Coder picked up Yaearla, and went to Ms. Tremell's house, where Sarah also was located. During the time she was at Ms. Tremell's house, she received several angry phone calls from Marla Underwood. (Tr. I, 186.) Then Mike Underwood arrived, and he was irate, complaining that someone had taken his dope. (Tr. I, 187-88.) He left after five minutes to go to Yaearla's house. (Tr. I, 189.)

Coder, Yaearla and Sarah got into Coder's car and headed to Yaearla's house, because Yaearla's younger sister Lindsay was there and had called to say she was scared. (Tr. I, 190.) When they arrived, no one else was there. As Coder got ready to leave, she received a phone call, and the caller asked to speak to Yaearla. Coder gave Yaearla her cell phone. (Tr. I, 191-92.) Less than a minute later, two cars pulled up. (Tr. I, 192.) The first car contained Mike and Marla Underwood, Petitioner, and an unknown man. (Tr. I, 193.) The second car contained Carla Aldridge and an unidentified male. (Tr. I, 194.) All six individuals got out of the car and began to argue with Yaearla and Coder. (Tr. I, 194.) They were angry because crack cocaine belonging to them had been misplaced. (Tr. I, 195-96.) During the argument, Marla Underwood slapped Yaearla Davis. (Tr. I, 198-99.) At that point, Coder was scared. (Tr. I, 199.) Without invitation, Petitioner went inside Yaearla's house. (Tr. I, 200.) Coder began to move slowly back toward her car. (Tr. I, 201.) She stood outside her car with her phone in her hand. (Tr. I, 202.) Coder had seen one police car drive by, and she tried to nonchalantly waive at it. (Tr., 202-03.) Shortly thereafter, Marla Underwood slapped Coder on the left side of her face. (Tr. I, 204.)

At this time, Petitioner came out of the house and made his way around to the passenger side of Coder's car and got in. (Tr. I, 205-06.) Petitioner told her to "get in the mother fucking car, cause we were going to get his money." (Tr. I, 207.) Coder was frightened of Petitioner because of his anger. Petitioner told her that she was going to take him to the bank and get him some money. (Tr. I, 207.) He told her that she owed him $1,000.00. She was scared and told him he could have what was in her wallet, about $38.00. He took it and told her it was not enough and that she would have to take him to get more money. (Tr. I, 208.) She tried to dial the police, and he told her to "put the fucking phone down." (Tr. I, 209.) She threw it onto the driver's seat. Before she

got into the vehicle, Petitioner picked up the phone and subsequently used it. (Tr. I, 209.) He told

her to go first to the ATM machine and then to a check-cashing place in South Bend. (Tr. I, 210.)

She told him that she did not want to take him anywhere. He responded that it didn't matter, this had

happened to him before, and he had had enough. He said he had to get his money no matter what

it takes. (Tr. I, 210, 224.)

       At that point, Coder was scared for herself, but she later became frightened for her

daughter. (Tr. I, 211.) Petitioner made it a point to make it clear that he was going to get all of his

money. (Tr. I, 212.) Coder drove to the ATM machine. When she arrived she realized that she did

not have her ATM card. He told her to go get it, so they drove to her house. (Tr. I, 213, 216.) Two

people called for her, but Petitioner refused to give her back her cell phone. (Tr. I, 213.) He asked

her whose numbers they were, and she told him that one was Ms. Tremell and the other was her

friend Kelly. (Tr. I, 214.) Petitioner went into the house behind her, using her cell phone. As he

entered the house, the cell phone started to lose reception, so he stepped just outside and stood in the

doorway, where he could see her. (Tr. I, 216-17.) Coder called Ms. Tremell on her kitchen phone.

Petitioner asked who she was calling, and she told him. (Tr. I, 217-18.) She was afraid to call the

police, because he could hear her, so she called Ms. Tremell, who was watching Coder's daughter.

(Tr. I, 219.) Based on her conversation with Ms. Tremell, Coder believed that steps were being

taken to help her and that Ms. Tremell would call the police. (Tr. I, 222.)

       Petitioner ordered Coder back in the car and told her they were going to South Bend.

They drove to a Check and Go at Petitioner's direction. (Tr. I, 222.) Petitioner was making calls

on her cell phone during the drive. (Tr. I, 223.) At one point, Petitioner talked to Ms. Tremell. He

handed the phone to Coder and ordered her to tell Ms. Tremell that she was alright. (Tr. I, 224.) As

soon as she did so, he took the phone back. (Tr. I, 224.) When they reached the Check and Go at about 1:45 p.m., Coder was crying. (Tr. I, 226.) She recognized the employee as Stacey Clark, someone she had gone to school with. (Tr. I, 225-26.) Coder filled out the loan application. She was nervous, so she had trouble filling it out correctly. (Tr. I, 227.) Stacey Clark ultimately had to fill out the check for her. (Tr. I, 231.) During the entire time, Petitioner stood less than a foot away from her. (Tr. I, 228.) Coder testified that she did not ask Stacey Clark to call the police because Petitioner was standing right next to her. (Tr. I, 232.) Coder asked for as much money as she could get. (Tr. I, 229.) Stacey told her she was authorized for only $250.00. (Tr. I, 229.) She accepted the money. As they were leaving, Defendant told Coder that $250.00 was not enough. (Tr. I, 230.)

He then told her to drive to an ATM machine, though he did not tell her which one. (Tr. I, 233.) She went to the nearest ATM. (Tr. I, 233.) At trial, she identified pictures taken of the ATM transaction and the receipt. (Tr. I, 235-36.) She withdrew $200.00, which was the maximum that could be taken from her account in a given day. (Tr. I, 237.) Petitioner then told her that that would be enough for the day, which was a Sunday. (Tr. I, 238.) In total, Coder gave Petitioner $528.00 that day. (Tr. I, 241.) He told her he would call her first thing in the morning so that she could pick him up and take him to get the rest of what he claimed she owed him. (Tr. I, 241.) He told her he intended to get his full $1,000.00 (Tr. I, 242.) She again tried to tell him that she was not responsible, but Petitioner did not care. Coder testified that she was significantly better off financially than Yaearla. (Tr. I, 243.)

After Petitioner gave her her phone back, Sarah called. She heard how shaky Coder was, and she did not want Coder to drive. Coder then picked up Sarah at Yaearla's house and they drove back to Ms. Tremell's to pick up her daughter. (Tr. I, 245.) Coder did not call the police

immediately because she just wanted her daughter. (Tr. I, 245.) She did not explain to Ms. Tremell what had taken place, but as she was in the driveway getting ready to leave, Ms. Tremell's husband, Mr. Gruncey, came out of the house, made her get into the car and took her to the Niles Police station. (Tr. I, 246.)

She told the police exactly what she said in court. (Tr. I, 246.) The total time that elapsed between dropping off Petitioner and talking to police was about 45 minutes. (Tr. I, 247.) She did not review the reports prepared by the officers at the time, but had recently reviewed them. She stated that the reports contained some mistakes. (Tr. I, 247.) The police made arrangements that, the following morning, Coder would pick Petitioner up and take him to the bank. (Tr. I, 251.) The police would then pull her over. (Tr. I, 251.) After the meeting with the police, Mr. Gruncey then drove her back to the Tremell house. Tremell and Gruncey wanted her to stay at their house overnight, but she went home with her daughter. (Tr. I, 248-49.) Petitioner called her the next morning and told her he was ready. (Tr. I, 251.) Coder called and spoke with Detective Krueger. (Tr. I, 249, 252.) Coder then picked Petitioner up at the Grant Street Apartments. (Tr. I, 250.) He told her to go to the bank to get the balance of what she owed him. (Tr. I, 252.) Less than five minutes later, the police stopped her car. (Tr. I, 253.) When the officers were standing outside the car door, Petitioner told her that she needed to come bond him out or that he would send his people to her house. (Tr. I, 254-55.) Petitioner was arrested. (Tr. I, 256.) She made no attempt to arrange his bond. (Tr. I, 255.)

Later that day, Petitioner called her from the jail and asked when she was going to get there to bond him out. (Tr. I, 256.) He repeated that he did not want to have to send his people over to her house. (Tr. I, 257.) Since that date, a friend of Petitioner's has attempted to contact her

about the case, but she did not know who the person was. (Tr. I, 258.) The parties stipulated to the introduction of Brandi Coder's cell phone records. (Tr. II, 5.) Coder repeatedly acknowledged that Petitioner neither touched her nor made threats against her or her family. (*See, e.g.*, Tr. II, 48, 50, 52, 64-66, 74.) She felt threatened because of Petitioner's demeanor and tone of voice. (Tr. II, 76.)

Marcel Cutler testified that he had known Petitioner for several years. On July 10, 2005, Cutler went to Yaearla Davis' house with a man he called "Punkin." Also at the house were Petitioner, Michael Underwood, Marla Underwood, Yaearla Davis and her sister, and Brandi Coder. Cutler did not know Coder at the time. (Tr. II, 121.) He and Punkin went to the house in one car. Petitioner, Carla Aldridge, Michael and Marla Underwood came in the Underwoods' car. (Tr. II, 122.) The other car arrived first, and Cutler received a call from Michael Underwood to come. (Tr. II, 124.) When he arrived, Marla and Mike were arguing with Yaearla Davis and Brandi Coder. (Tr. II, 125.) He saw Yaearla get slapped and then Coder got slapped. (Tr. II, 126.) The last he saw, Coder was standing outside her car. Cutler did not see Petitioner get into Coder's car. (Tr. II, 127.)

Michael Underwood testified that he knew Petitioner as "Big City" for a couple of years. (Tr. II, 133.) On July 10, 2005, Underwood, his wife and his wife's cousin, Carla Aldridge, went to Yaearla Davis' house. (Tr. II, 134.) They were dropping off Yaearla's daughter before going to the beach. (Tr. II, 136-37.) Petitioner was not in the car with them, but he arrived at the house at about the same time. (Tr. II, 137.) Underwood testified that he did not speak to Petitioner that day. Underwood denied being unhappy with either Yaearla or Brandi Coder. He also denied that any argument took place or that anyone was hit. (Tr. II, 138.) Underwood stated that he had spoken with Detective Krueger on July 19, 2005, but he denied telling Krueger that Petitioner had called him on the phone to tell him that "there was some bullshit going on and someone had taken

his money." (Tr. II, 139.) He also denied telling Krueger that Petitioner said that he wanted half his money from each Brandi Coder and Yaearla Davis. (Tr. II, 140.) When things were "about to get crazy," Underwood left, because he was on probation and didn't want trouble. (Tr. II, 141.) In addition, he denied telling Krueger that he received a call from Petitioner later, in which Petitioner told Underwood that he was in the car with Coder and was not getting out "until I get my [m f'ing] money." (Tr. II, 141.) Underwood denied having told Detective Krueger that Brandi Coder told Petitioner that she had nothing to do with the matter or that Coder was afraid of Petitioner. (Tr. II, 142-43.) He also denied having told Krueger that Brandi Coder had to pay the money because she was the only white girl there. (Tr. II, 144.)

Niles Police Detective Richard Krueger took the stand. He testified that he interviewed Michael Underwood on July 19, 2005 and audio-recorded the interview. He identified the CD of the interview. (Tr. II, 148-49.) The court admitted the recording under Michigan Rule of Evidence 613(b) and instructed that the recording was to be considered solely for the purpose of impeaching Underwood's credibility. (Tr. II, 153.) Krueger testified that Underwood understood at the time he was interviewed that he was being taped. (Tr. II, 155.) His statement to Krueger, however, was ninety percent different than his in-court testimony. (Tr. II, 155.) The recording began to be played for the jury. Defense counsel objected to a statement by Krueger during the interview that indicated that Petitioner was a known felon, and the recording was stopped. (Tr. II, 164.) Outside the presence of the jury, the court chastised both sides for failing to recognize that the interview contained inadmissible evidence that should have been excluded. (Tr. II, 166.) The court then considered whether a cautionary instruction had the potential to cure the error. (Tr. II, 166.) Defense counsel indicated that he believed a mistrial was necessary and that an instruction could not

cure the error. Defense counsel stated, however, that his client wished to continue with the jury as seated, so defense counsel did not move for a mistrial. (Tr. II, 170.) The prosecution argued that the jury was not irretrievably tainted. (Tr. II, 170.) The court indicated that he would give the jury an instruction to not consider what they had heard of the tape to that point. The recording could only be reintroduced when the parties had ensured that it contained nothing that was inadmissible. (Tr. II, 172.) The parties ultimately agreed to a three-and-one-half-minute version of the tape. (Tr. II, 172.) After being advised by the court that, by choosing not to move for a mistrial, he most likely was waiving his right to appeal the problem, Petitioner agreed that he wanted to continue. (Tr. II, 174-75.) The court declined to grant a mistrial on its own motion. (Tr. II, 175.)

Carla Aldridge testified that she knew Brandi Coder because Aldridge's cousin was the father of Coder's baby, but she did not have much to do with Coder. (Tr. II, 181.) Petitioner was Aldridge's boyfriend until 2000, and they remain friends. (Tr. II, 182.) On July 10, 2005, Aldridge, Mike Underwood, Marla Underwood and Petitioner were in the car together. They went to Yaearla's house to drop off her child. (Tr. II, 183.) Aldridge remained in the car while the others got out. (Tr. II, 184.) Everyone was arguing, including Petitioner, the Underwoods, Sally and Marcel. (Tr. II, 184.) After the argument, the Underwoods got back in the car with Aldridge, and Petitioner drove off with Coder. (Tr. II, 187.) Aldridge did not see Petitioner go into the house, and she did not see Petitioner touch or threaten Coder. (Tr. II, 188.)

Yaearla Davis testified that she knew Petitioner, whom she also called "City." His best friend was the father of her child. She considered Petitioner to be a friend, and she had known him for ten years. (Tr. III, 10-11.) Brandi Coder had been Yaearla's best friend for 16 years. (Tr. III, 11.) On July 9, 2005, Yaearla and Coder had spent the day together. (Tr. III, 12.) In the evening,

Mike Underwood gave Yaearla an unknown item in a plastic carrier bag, which she brought into Coder's car and put underneath the passenger seat. (Tr. III, 12.) Underwood told her to keep it until he called her. (Tr. III, 13.) Yaearla understood that the item was something illegal, but she did not know what it was. (Tr. III, 13.) She eventually went home that night, leaving the package in Coder's car. (Tr. III, 14-15.) She called Coder in the morning to ask Coder to bring the package to her. (Tr. III, 15-16.) According to Yaearla, Coder knew that the package was there. Yaearla told Detective Krueger on July 12, 2005 that she put a bag containing crack cocaine in Coder's car. (Tr. III, 15.) When Yaearla first called, Coder was at her mother's house. Coder planned to meet Yaearla at Coder's house. Yaearla walked there, and, when Coder was not home, began to walk home. Coder picked her up on the way. (Tr. III, 17.) About five or ten minutes after they reached Yaearla's home, two cars arrived. (Tr. III, 17.) In those cars were Marla and Mike Underwood, Petitioner, Carla Aldridge, and Marcel Cutler ("Cellie"). (Tr. III, 18.) She was expecting them because the package was lost. (Tr. III, 19.) People began to argue, primarily Yaearla and Marla Underwood. Marla eventually hit Yaearla and later hit Coder. (Tr. III, 19-20.) During this time, Petitioner sat on Yaearla's front steps for about 20 minutes. He then went over to Coder's car and talked with her. (Tr. III, 20.) Petitioner and Coder got into the car together. (Tr. III, 21.) Coder did not look upset. (Tr. III, 22.) According to Yaearla, Coder had her cell phone at first, but Petitioner had it thereafter. (Tr. III, 22.) Yaearla testified that she was not afraid for Coder's safety. (Tr. III, 22.) Yaearla attempted to reach Coder on her cell phone, but Petitioner kept answering the phone and would not let her speak with Coder. (Tr. III, 23.)

On July 20, 2005, Yaearla called Detective Krueger to see if he could stop the calls from the jail that she was receiving from Petitioner. (Tr. II, 23-24.) She also told Krueger that Petitioner wanted her to get a message to Coder. (Tr. III, 24.) Yaearla wanted the calls stopped because she was not in the car and did not know what happened between Coder and Petitioner. She was friends with both of them and she felt that something wasn't right. (Tr. III, 26.) She clarified that she did not believe that Coder had been kidnaped, as she gave him $40.00 at the house and voluntarily drove him to the ATM. (Tr. III, 28.) Yaearla testified that Petitioner did not ask Coder for money. (Tr. III, 28.) She also testified that Coder was standing next to her when she was given the drugs. (Tr. III, 29, 32.)

Krueger testified that he interviewed Yaearla Davis on July 12, 2005. She told him that she hid a bag of crack cocaine inside Brandi Coder's car and that Coder told her that she never saw the drugs. (Tr. III, 39, 44.) She also told him that she was frightened for Coder's safety. Coder had been missing for almost two hours and she was frightened because anything could have happened. (Tr. III, 39.) On July 20, 2005, he received a call from Yaearla Davis, asking him to stop the phone calls she was getting from Petitioner from the jail. She told Krueger that she did not want to be involved with the case anymore and was frightened for her own well-being. (Tr. III, 40.)

Virsarah Davis testified that she had known Brandi Coder since she was eleven years old. (Tr. III, 46.) They were friends, but they rarely spoke anymore. (Tr. III, 47.) Virsarah also knew Petitioner for about eight years, though she hadn't spoken with him for awhile. (Tr. III, 48.) On July 10, 2005, Virsarah was at her sister Yaearla's house with Brandi Coder. Petitioner arrived, together with Marla and Mike Underwood, Carla, Marcel, and a man Virsarah did not know. (Tr. III, 48.) They drove two cars. (Tr. III, 48.) Before they arrived, Yaearla and Coder were talking

about something in a bag that was missing, which Virsarah understood involved drugs. (Tr. III, 49.)

Mike and Marla Underwood were screaming, yelling, and swearing at Yaearla, Coder and Virsarah.

(Tr. III, 49-50.) Virsarah was surprised, as the Underwoods were her son's godparents. Marla

slapped first Yaearla then Coder. (Tr. III, 50.) Petitioner was sitting inside Yaearla's house during

the argument. (Tr. III, 50.) Petitioner went to Coder's car and got in. Coder told him that she would

pay him the money. (Tr. III, 51.)

Virsarah gave a statement to Niles Police Officer Rob Edmondson. (Tr. III, 51.) She

told him that Coder had asked her to get in the car with her. (Tr. III, 52.) Virsarah denied that

Petitioner said anything about getting into the car. (Tr. III, 52.) She testified that she was not

worried about Coder and did not keep track of the time. She denied telling Edmondson otherwise.

(Tr. III, 52.) She later testified that she was a little bit worried. (Tr. III, 53.) Earlier in the morning,

Mike Underwood had come to Virsarah's mother's (Ms. Tremell's) house, and he was very angry

with Yaearla and Coder. (Tr. III, 55.) At that time, Brandi Coder indicated to Virsarah that she

knew that there had been drugs in the car. (Tr. III, 59.) After Coder came back from being with

Petitioner, she had red eyes. Virsarah went to the police station with Coder later in the day. (Tr. III,

62.) Virsarah testified that she did not believe Petitioner was properly charged, based on what she

had witnessed. (Tr. III, 66.)

Stacey Clark testified that she worked at Check Smart in South Bend, Indiana, which

is located about 25 minutes from Niles, Michigan. (Tr. III, 68.) She was the assistant manager and

had worked there for six years. (Tr. III, 69.) She was working on Sunday, July 10, 2005. (Tr. III,

70.) She had known Brandi Coder from high school, and she was mildly friendly with Petitioner,

though she had not seen either in years. (Tr. III, 71-72.) At about 12:00 p.m. Indiana time, which

was about 1:00 p.m. Michigan time, Brandi Coder and Petitioner came into the Check Smart. (Tr. III, 74-75.) Coder asked for a loan for as much as Clark could give her. She gave Coder an application and made copies of her check and her ID, as well as her most recent pay stub. (Tr. III, 75.) Clark was surprised to see Coder and Petitioner together, as she did not know they knew each other. (Tr. III, 76.) When Coder came in, she was crying or had been crying and seemed upset. (Tr. III, 76, 87.) Clark asked what was wrong, and Coder replied, "Oh, nothing. Just . . . just a lot of bullshit but it'll be all right." (Tr. III, 76.) Based on the forms, Clark told Brandi Coder that the most she could get was $250.00. Coder responded, "Is that all?" (Tr. III, 77.) Petitioner looked at Coder and told her, "It's okay." (Tr. III, 77.) Petitioner was standing at an angle to Coder, about eight to ten feet away, walking back and forth. (Tr. III, 79.) Petitioner mentioned something being stolen, saying, " . . . but I know he didn't take it, but I'm not worried about it." (Tr. III, 80.) Clark understood Petitioner was referring to Jason Drake. (Tr. III, 81.) He also stated, "That's why you got to be careful who your friends are." (Tr. III, 84.) He also said, "Good, it's good to know because I would have to walk up and do him . . . ." (Tr. III, 90.) Petitioner seemed frustrated. (Tr. III, 83.) Coder had some difficulty and made the check out wrong, and Clark wrote out a new one for her. (Tr. III, 88, 92.)

Niles Police Officer Robert Edmondson was called to impeach Virsarah Davis. He testified that, on July 10, 2005, he spoke with Virsarah Davis about a complaint filed by Brandi Coder, and he filed a police report about the interview. (Tr. III, 97.) Virsarah told him that she tried to get into Brandi Coder's car when Petitioner was in the car. (Tr. III, 98-99.) She also told Edmondson that Petitioner said, "[S]he is going to do what I tell her to do and you ain't going with us." (Tr. III, 99.) Virsarah told Edmondson that she was worried about Coder because she had been

gone a long time.  (Tr. III, 99.)  Virsarah also said that she had tried to call Coder's cell phone several times and that Petitioner answered and told her, "You are not talking to her until she does what I tell her to do."  (Tr. III, 99.)

Tremell Denise Guernsey testified that Brandi Coder had been a friend of her two daughters for years.  Coder also had lived with Tremell for about a year when she was sixteen years old. (Tr. III, 109.)  She knew who Petitioner was.  (Tr. III, 110.)  On July 10, 2005, she received a phone call from Brandi Coder from her home.  Coder was whispering and she sounded shaken.  (Tr. III, 110-11.)  Coder wanted Tremell to call the police and tell them to meet her at the Eastgate ATM machine.  (Tr. III, 111.)  She at first thought it was a joke and she did not know what to say to the police because she did not even know what kind of car Coder drove, only the color of it.  (Tr. III, 111.)  About 20 minutes later, Coder called again, but the phone hung up.  (Tr. III, 111.)  Tremell was watching Coder's daughter and was concerned about Coder.  (Tr. III, 111.)  Coder told her she was with Petitioner.  Coder called her again within the hour to say that she was heading towards South Bend, something she had never done before.  (Tr. III, 112.)  Coder also told her that they were going to get money.  (Tr. III, 120.)  Tremell called her back and talked to Petitioner, who said everything was fine.  She also spoke to Coder, who seemed calmer.  Coder asked about her daughter and told Tremell she would be there soon.  (Tr. III, 113.)  Tremell testified that Coder sounded scared at first, and she told Detective Krueger that she thought Coder was being forced to do something she did not want to do.  (Tr. III, 113.)  The prosecution rested.  (Tr. III, 121.)

Defense counsel moved for a directed verdict, arguing that the prosecution had failed to introduce sufficient evidence that Petitioner committed kidnaping because it failed to show that Petitioner had "forcibly confine[d] or imprison[ed]" Brandi Coder.  (Tr. III, 124.)  In addition,

defense counsel argued that the prosecution had failed to show asportation beyond that necessary to the offense of larceny. (Tr. III, 129-38.) After lengthy analysis, the court rejected both arguments. (Tr. III, 152, 160-61.) The parties discussed the jury instructions. (Tr. III, 162-185.) Defense counsel sought an instruction that the asportation requirement of kidnaping could not be shown only by the incidental asportation necessary to the underlying offense of larceny from a person. (Tr. III, 180.) Defense counsel also asked for an instruction that mental coercion was insufficient to demonstrate the force necessary for kidnaping. (Tr. III, 181-82.) The court rejected both arguments. (Tr. III, 180, 182-83.) The court also denied defense counsel's request for an instruction on the underlying offense of larceny from a person. (Tr. III, 183-85.)

Niles Police Officer Michael Stanton was called by the defense. He testified that he was involved with the arrest of Petitioner on July 11, 2005. (Tr. III, 195.) As he approached the car, Stanton heard Petitioner say something about bond. (Tr. III, 195-96.) To his recollections, Petitioner looked at Brandi Coder and asked her to make some calls to get him out of jail on bond. He did not recall hearing Petitioner say anything about men going to Coder's house. (Tr. III, 196.) Stanton testified, however, that he could not hear anything Petitioner said between the time the car was pulled over and the time he parked his cruiser and approached Coder's car. (Tr. III, 197-99.) By stipulation, the defense introduced a portion of Brandi Coder's preliminary examination testimony. (Tr. III, 206.)

At the conclusion of trial, on September 30, 2005, the jury found Petitioner guilty of kidnaping. (Tr. III, 261.) On November 7, 2005, Petitioner was sentenced to serve a term of 15 to 66 years as an habitual offender. (Sentencing Transcript, (S. Tr.), 39, docket #16.)

## B.    Direct Appeal

Petitioner filed a delayed application for leave to appeal to the Michigan Court of Appeals. His brief, which was filed by counsel on November 8, 2006, raised the same four issues presented in this application for habeas corpus relief. (See Def.-Appellant's Br. on Appeal, docket #17.) By unpublished order issued on June 4, 2007, the Michigan Court of Appeals denied leave to appeal for lack of merit in the grounds presented. (See 6/4/07 Mich. Ct. App. Ord. (MCOA Ord.), docket #17.)

Petitioner filed a pro per application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same four claims raised before and rejected by the Michigan Court of Appeals. By order entered October 31, 2007, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (See Mich. Ord., docket #18.)

## **Standard of Review**

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court

of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final."  *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Williams*, 529 U.S. at 411;

*accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

### Discussion

I.    <u>Sufficiency of the Evidence</u>

In his first ground for relief, Petitioner asserts that the prosecutor introduced insufficient evidence to support all elements of the kidnaping charge. He specifically contends that

the evidence was insufficient to support a conclusion that the asportation was more than incidental to an underlying larceny offense. He also urges that the evidence was insufficient to support a finding that Coder was forcibly confined. In addition, he argues that Coder was not credible, that her testimony at trial was inconsistent with that given at the preliminary examination, and that Coder's testimony was inconsistent with the testimony of other witnesses. Finally, he argues that the fact that the prosecutor initially charged the offense as extortion and that the magistrate concluded that there was insufficient force to prove an extortion demonstrates the inadequacy of the kidnaping charge.

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." This standard of review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Id.* Issues of credibility may not be reviewed by the habeas court under this standard. *See Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Rather, the habeas court is required to examine the evidence supporting the conviction, in the light most favorable to the prosecution, with specific reference to the elements of the crime as established by state law. *Jackson*, 443 U.S. at 324 n.16; *Allen v. Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

At the time of Petitioner's trial, the kidnaping statute provided in relevant part as follows:

Any person who willfully, maliciously and without lawful authority shall forcibly or secretly confine or imprison any other person within this state against his will, or shall forcibly carry or send such person out of this state, or shall forcibly seize or confine, or shall inveigle or kidnap any other person with intent to extort money or other valuable thing thereby or with intent either to cause such person to be secretly confined or imprisoned in this state against his will, or in any way held to service against his will, shall be guilty of a felony, punishable by imprisonment in the state prison for life or for any term of years.

MICH. COMP. LAWS § 750.349, *amended by* P.A. 2006. No. 159, eff. Aug. 24, 2006. In *People v. Wesley*, 365 N.W.2d 692, 694 (Mich. 1984), the Michigan Supreme Court recognized that the statutory definition includes several forms of kidnaping:

Thus, a person can be convicted of kidnapping if it is proven beyond a reasonable doubt that he or she wilfully, maliciously and without lawful authority,

(a) forcibly or secretly confined or imprisoned any other person within this state against his will, or

(b) forcibly carried or sent such person out of this state, or

(c) forcibly seized or confined, or inveigled or kidnapped any other person

(1) with intent to extort money or other valuable thing thereby, or

(2) with intent either

(A) to cause such person to be secretly confined or imprisoned in this state against his will, or

(B) [to cause such person to be] in any way held to service against his will.

*Id.* In the instant case, the prosecution charged Petitioner under the first two theories: (1) that he willfully, maliciously and without lawful authority forcibly carried or sent Brandi Coder out of the state, and (2) that he willfully, maliciously and without lawful authority forcibly seized or confined

- 21 -

Brandi Coder within the state. (Tr. III, 142.) The jury was instructed that it had to find the following elements:

> First, that the defendant forcibly confined or imprisoned Brandi Coder against her will and/or that the defendant forcibly carried or sent Brandi Coder out of this state against her will.
>
> Second, that the defendant did not have legal authority to confine Brandi Coder or to carry her or send her out of this state.
>
> Third, that while he was confining Brandi Coder and/or carrying or sending Brandi Coder out of the state, the defendant forcibly moved or caused Brandi Coder to be moved from one place to another for the purpose of kidnapping.
>
> Fourth, that the defendant intended to kidnap or confine Brandi Coder and/or intended to carry or send her out of this state.
>
> Fifth, that the defendant acted willfully and maliciously. This means that the defendant knew that it was wrong to confine Brandi Coder and/or that he knew it was wrong to carry her or send her out of this state, and he knew that he did not have the legal authority to do so.

(Tr. III, 244.) The court's instruction was taken from the Michigan Standard Jury Instructions. *See* MICH. CRIM. STAND. JURY INSTR. 2D 19.2.

As an initial matter, Petitioner's arguments about Coder's credibility and the conflicting evidence will not support a finding of insufficient evidence. As the *Jackson* Court recognized, the resolution of conflicting evidence and the assessment of witness credibility is reserved for the jury. *See Jackson*, 443 U.S. at 319.

On the question of the force necessary to show forcible confinement, the trial court delivered an extensive analysis before denying Petitioner's motion for directed verdict:

> THE COURT: If I miss-paraphrase it, then tell me I'm wrong. But, basically, what Mr. Sible is saying is that, no rational trier of fact, as Mr. Rhoa quite rightly points out is the standard, no rational trier of fact could reasonably conclude here that Miss Coder was forcefully confined. Now – And because of that, because no rational

jury could come to that conclusion, that we should at this point direct a verdict of acquittal, end the case. And, also as Mr. Rhoa has pointed out, I have to consider the evidence on that issue in the light most favorable to the People before I can take that case away from the jury.

Now, here's the situation that we have. On the July 10th when this offense began – correct on the date on that? – July 10th, that Miss Coder was at a location, someone else's house, that she was with a friend of hers, that she already knew that there was something missing, she already knew that the something missing was important, and that her friend, Miss Davis – Yaearly [sic] Davis, was upset about this. And that, when they were at this location – in fact, she was with Miss Davis at Miss Davis' house – that, as she was preparing to leave, cars pulled up with numerous people in them; those people were – all but about one, I believe, although I believe Miss Sarah Davis, I think jumped out of their cars and almost instantaneously a quickly heated argument ensued.

During the course of that argument, Mr. Woods, the defendant, apparently went inside to the residence, and Mr. Underwood and his wife were outside. They were screaming, yelling, swearing at Miss Yaearla Davis and Miss Coder, and that, the gist of that argument were – was that they were missing drugs and that Miss Davis and Coder had something to do with it.

In the course of that argument, Miss Davis – Yaearly [sic] Davis was slapped by this Mrs. Underwood – and we should – I should point out that hasn't testified in this case but their name's been all over the case – and Miss Coder was slapped by this person. So, in effect, those two people could have been arrested at that moment if there had been somebody to call – if the police had been called. They weren't, but could have. Certainly a startling and disturbing event for those two people that were slapped.

The argument continued. At some point, during this argument with all these people, as described by Miss Coder, standing in a semicircle – It was one of the exhibits that the People admitted. And it was Exhibit Six. Exhibit Six was a diagram, and she was asked to point our the various spots where these folks were located and she pointed out a semicircle around her and Miss Davis where there was yelling and finger -pointing at them about these missing drugs. At some point during this, Mr. Woods got into, according to the victim – victim's testimony, Miss Coder's car. He was sitting in her car, and that a friend, Sarah Davis – Virsarah Davis, tried to get into the car, was ordered out by Mr. Woods, that when Miss Coder got into the car to drive – was standing outside the car, Mr. Woods ordered her into the car with words to the [e]ffect of: Get in the motherfuckin car, I'm gonna get my motherfuckin money.

Now, that is, as described by Mr. Rhoa this morning, not an invitation to a birthday party; in the middle of an argument, about missing drugs, with angry people, and a gentleman who has now ordered the person into the car who is – I don't know what anybody weighs, or height, but I'm gonna guess – at least one and a half times the size of the victim, if not more, and then, when she did get into the car, Mr. Woods, almost immediately, got possession of her cell phone as she was making a call, as I recall the testimony correctly; that she was making a telephone call and the phone was taken from her, which now cut off her communication, and she was cut off from having a friendly third person in the car and very quickly told to drive to another location so that Mr. Woods could retrieve his money that he described in much more colorful terms.

Now, from those circumstances and those facts, and, of course, considering the rest of the story which she testified to, Miss Coder, that she was taken – forced to drive, according to her testimony, to her house, to South Bend to the check place, for all purposes of getting a loan, and then to an ATM machine also in Indiana, I think considering evidence in light most favorable to the People, a rational trier of fact could most certainly conclude that that was forcible confinement.

I will tell you that there's no standard jury instruction as far as the kidnapping statute is concerned that defines force. I also read the <u>Walker</u> case, 135 Mich. App. 311[,] Mr. Sible cited. That case charge[d] secret confinement. It was apparently a very notable case. It had a lot of television coverage and so on.

But, in that particular case, what the Prosecutor had argued, at least in their appellate briefs, I don't know what – for sure what they argued all at trial, but it was charged – they were charged with secret confinement, the defendants, and the Prosecutor had made the argument that the victims in this case, who were elderly ladies from a nursing home, had been the subject of fraud and, to some extent, duress, in basically tricking the, or duping them out of their location in Florida up to a location in Michigan, where the kidnapping charge, then, was brought. Totally distinguishable on its facts, because that is a secret confinement case, to the extent that case says that mental coercion is not enough. I agree with it.

But I don't think that mental coercion is what's alleged here. Mental coercion, in the context of the <u>Walker</u> case, I would classify as deceit, fraud, duress, trickery, or, as I described it earlier, duping these women in the <u>Walker</u> case out of their residence in Florida and up to Michigan. And that is not what's present here.

You can't say that because there is no physical assault, no physical touching or grabbing that mere words always amount to just mental coercion. A large gentleman, who is much larger than the victim, who is angry, surrounded by angry people, one of whom has just assaulted the victim, and also that the defendant, who

is the larger gentleman, takes residence, if you will, or temporary residence in the automobile of the victim, commandeers her cell phone and says, get in the motherfuckin car, we're gonna get my motherfuckin money, is not the same as saying that she was duped, tricked, defrauded, or mentally coerced into getting money for Mr. Woods or driving Mr. Woods to some other location. That is a reasonable – A rational trier of fact can conclude that that is force. That is beyond mental coercion. It's not the same thing.

On that basis, I find that – considering that evidence in the light most favorable to the People – Oh, I wanted to point out one other thing. I'm sorry.

The case that I was – One of the cases I was looking to, and Mr. Sible had referred to but not by name, was People – or, maybe you did – <u>People v. Kuchar</u>. I [sic] is that the one? It's 225 Mich. App. 74. It's a 1997 case. And on the last page of the Opinion, at page 78, they were talking about – the Court's talking about an instruction on Assault and Battery. And beginning at 77, the bot – near the bottom of the page,

> "Because defendant did not request an instruction regarding Assault and Battery, the trial court did not err in failing to give such an instruction and defendant was not denied his right to a properly instructed jury. Furthermore, even though – even if defendant would have requested an instruction regarding Assault and Battery, we do not believe that such an instruction would have been warranted given the lack of an inherent relationship between the two crimes at issue."

And then they quote <u>Rollins</u>, 207 Mich. App. 465. And they said in <u>Rollins</u>,

> "This Court decline[s] to find that inherent relationship between kidnapping under 750.349 and Assault and Battery because kidnapping is not necessarily an assaultive crime."

So that, I think, makes it quite clear the Court of Appeals in this state has said there doesn't have to be an assault to have kidnapping. What there has to be is force. And force and assault are two different things.

Now, on that basis, I find in the light most favorable to the People a rational trier of fact could conclude that there has been forcible confinement of the victim by the defendant. In that regard, the defendant's motion for directed verdict is denied.

(Tr. III, 146-52.)

The trial court properly applied the appropriate constitutional standard in determining whether sufficient evidence supported the element of force necessary to prove forcible confinement. Moreover, the court thoroughly and carefully summarized the facts presented at trial that would support a jury's finding of such force. The whole of the circumstances supported an inference that force would be used if Coder refused to comply: the relative size of Petitioner and Brandi Coder; the number of people who arrived in the two vehicles, including Petitioner, most of whom half-surrounded Brandi Coder and Yaearla Davis; the loudness of the screaming of members of this group at Coder and Davis; the fact that one of Petitioner's compatriots slapped Coder and Davis in the face while insisting that they were responsible for the loss of the drugs; the fact that Petitioner got into Coder's car unasked, refused to allow Davis into the car, and demanded in angry tones that Coder "get in the motherfuckin car, we're gonna get my motherfuckin money"; the fact that Petitioner took Coder's cellphone from her when she got into the car and would not let her make calls; the fact that he told her where to drive and what to do, including determining whether the money available at the check-cashing store would be sufficient. The jury had ample evidence from which to conclude that Petitioner used substantial implicit force to confine Coder in her vehicle until Petitioner was satisfied he had gotten as much money from her as he could get. The state court's determination on this component of the offense therefore constituted a reasonable application of established Supreme Court precedent.

Petitioner also challenges the sufficiency of the evidence of asportation to support the offense. He argues that the asportation was limited to that necessary to commit an underlying offense of larceny. Petitioner's argument is without merit. The trial court determined that the kidnaping in issue did not involve an underlying offense of larceny from a person. Instead, the court

found that the situation was one involving a disputed debt and Petitioner's efforts to collect it. The court therefore declined to instruct on an uncharged underlying offense and instructed the jury that it had to find that Petitioner "forcibly moved or caused Brandi Coder to be moved from one place to another for the purpose of kidnapping."[2] (Tr. III, 160, 244.)

The evidence unquestionably was sufficient to support the jury's conclusion that Brandi Coder was forcefully moved, both within the state and across state lines. Petitioner caused Brandi Coder to be taken first to her bank, then back to her home, across state lines to the check-cashing store, and then to the ATM. She was not permitted to use her phone except at his direction, and Petitioner controlled where she would drive next. As the trial court found, the jury had ample evidence to conclude that Petitioner forcibly caused Coder to be moved from one place to another for the purpose of kidnaping. (Tr. III, 160-61.) The state court's determination therefore was a reasonable application of established supreme court precedent.

Petitioner's final argument is meritless. The fact that the prosecutor did not initially charge kidnaping is irrelevant to whether sufficient evidence was presented to support the charge. The "'authority to initiate a criminal complaint rests exclusively with state and federal prosecutors.'" *Gonzalez v. Perez*, No. 98-6575, 2000 WL 222584, at *2 (quoting *Mercer v. Lexington Fayette Urban County Gov't.*, No. 94-6645, 1995 WL 222178, at *1 (6th Cir. Apr. 13, 1995)). This Court has no authority to examine the prosecutor's charging decisions. Moreover, the mere fact that the district court concluded that insufficient force was demonstrated at the preliminary examination to

---

[2]In his second habeas ground, Petitioner argues that the trial court denied him due process by rejecting his request that the jury be instructed on the underlying offense and the requirement that the prosecution prove asportation beyond that necessary to the underlying offense. That claim will be addressed, *infra* at Section II(C).

support the charge of extortion has no bearing on whether sufficient evidence supported the crime for which Petitioner was tried. The trial court properly applied established Supreme Court precedent.

II.     Due Process:  Trial Court Errors

In his second ground for habeas relief, Petitioner raises numerous asserted trial court errors, which he contends denied him due process. First, he argues that the court erred in denying his motion for directed verdict. Second, he contends that the court erred in making several evidentiary rulings. Third, he asserts that the court improperly allowed the impeachment of Mike Underwood. Fourth, he argues that the court gave incomplete jury instructions regarding the elements of asportation and force, depriving him of his right to present a defense. Fifth, he contends that the court failed to take appropriate action to curtail prosecutorial misconduct.

**A.     Directed verdict**

Petitioner's first argument, that the court violated his due process rights by denying his motion for directed verdict, merely reiterates his arguments regarding the sufficiency of the evidence. As previously discussed, ample evidence was presented to support all elements of the offense of kidnaping. As a consequence, the trial court did not deny Petitioner due process when it denied his motion for a directed verdict.

**B.     Evidentiary rulings**

In his second and third sub-claims, Petitioner argues that the trial court made several erroneous evidentiary rulings. First, he argues that the court improperly allowed into evidence the threat made by Petitioner to Brandi Coder at the time of his arrest, which was the day after the alleged kidnaping. Second, he contends that the trial court improperly refused to allow cross-examination of Brandi Coder on the issue of whether she considered herself to have been kidnaped.

Third, he argues that the court improperly allowed as impeachment evidence the admission of the recording of Mike Underwood's statement to police.

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000). Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner has not met this difficult standard. He fails to cite any case, much less any Supreme Court case, supporting his claim that the threat made to Brandi Coder during the course of

his arrest was inadmissible. Moreover, the threat, which was made to Coder while she was with Petitioner but cooperating with the police, was highly relevant to the question of force, because it supported the reasonableness of Coder's belief that she had to obey Petitioner or risk the life and safety of herself and her daughter. Admission of this evidence was not fundamentally unfair.

Similarly, the trial court reasonably refused to allow Petitioner to cross-examine Coder about whether she believed she had been kidnaped. No established Supreme Court precedent entitled Petitioner to seek Coder's legal opinion on whether the facts to which she had testified amounted to kidnaping. As the trial court found, Coder's belief whether Petitioner's actions met the legal requirements of the crime of kidnaping was a legal conclusion, not a statement of relevant fact. The jury, as the factfinder, was responsible for making the legal determination. As a result, the limitation on cross-examination was not fundamentally unfair and did not deprive Petitioner of his right to present a defense. *See United States v. Scheffer*, 523 U.S. 303, 308 (1998) ("[a] defendant's right to present evidence is not unlimited, but rather is subject to reasonable restrictions"); *see also Rock v. Arkansas*, 483 U.S. 44, 45 (1987); *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). The limitation on cross-examination was a reasonable application of established Supreme Court precedent.

Finally, Petitioner makes no effort to demonstrate that the introduction of Mike Underwood's statement to police for impeachment purposes amounted to a deprivation of due process. Although he includes the argument under his claim that he was denied due process, Petitioner focuses exclusively on whether the evidence was properly admitted under MICH. R. EVID. 403. As previously discussed, questions of state law are not the proper subject of a habeas corpus petition. *See Estelle*, 502 U.S. at 67-68.

Moreover, Petitioner fails to demonstrate any error in the admission of the statement. The record reflects that the jury was carefully instructed that their consideration of Underwood's recorded statement was to be considered only for purposes of determining his credibility and could not be used as substantive evidence. (Tr. II, 153-54, 162.) Prior to allowing the recording to be played, the court asked the parties whether any inadmissible evidence was contained on the tapes. (Tr. II, 151.) Defense counsel failed to identify any inadmissible evidence included in the statement other than some potential hearsay. (Tr. II, 151.) When the tape was played, however, it included a reference to the fact that police were contacting Underwood's probation agent because Underwood was with Petitioner, who is a known felon. (Tr. II, 164.) Defense counsel immediately objected and the recording was stopped. The court faulted both parties for not ensuring that inadmissible evidence would not be introduced. (Tr. II, 166.) The court then asked whether the defense wanted to move for a mistrial. (Tr. II, 170.) Defense counsel indicated that, although he believed a mistrial was necessary and that the error could not be cured, his client wished to continue with the trial. (Tr. II, 170.) The court inquired of Petitioner on the record whether he wished to continue with the trial, and Petitioner verified counsel's statement. (Tr. II, 171.) The court concluded that a *sua sponte* declaration of a mistrial was not appropriate on the facts of the case because there was some question whether the jurors actually had sufficient opportunity to understand the statement, and because the court would instruct the jury to disregard the entire tape that had been played to that point. (Tr. II, 173, 175.) The court warned Petitioner that his decision not to move for mistrial very likely would bar a challenge to the issue on appeal. Petitioner nevertheless continued to express his desire to proceed with the trial. (Tr. II, 174-75.) The court instructed the jury to disregard the contents of the recording as they had heard it to that point. (Tr. II, 177.) The court then permitted a brief,

stipulated portion of the recording to be played, and reiterated the instruction that the recording was to be used only for purposes of determining Underwood's credibility. (Tr. II, 172, 177-78.)

As a consequence, notwithstanding Petitioner's general arguments about inadmissibility, it appears clear that Petitioner personally elected to waive his objection to the inadmissible reference to Petitioner's being a felon, and the court instructed the jury at length to disregard the entire tape as it was first played. On the whole of the circumstances, Petitioner fails to demonstrate that the trial court's decision to admit the evidence for a limited purpose was erroneous, much less that it violated a fundamental principle of justice. The decisions of the state appellate courts to affirm Petitioner's convictions were neither contrary to nor an unreasonable application of established Supreme Court precedent.

## C. Jury instructions on asportation and force

Petitioner argues that the trial court deprived him of due process when it failed to instruct that the asportation had to be greater than that required to prove the underlying offense of larceny. The trial court rejected Petitioner's request for such an instruction, concluding that no underlying offense was charged in the instant case and that larceny from a person would not have been an appropriate charge. Instead, the court found, the underlying circumstances involved a disputed debt, not larceny. The court therefore concluded that it was appropriate to give the standard jury instruction for a kidnaping with no underlying criminal offense. In rejecting Petitioner's argument, the trial court reasoned as follows:

> This is a case of disputed debt, or a claim of theft made by the defendant against the complainant. The gist of this . . . case , that I can gather from listening to the witnesses that I've heard, is that Mr. Woods claims that Miss Coder stole something from him, and that something cost him a thousand dollars, and that he blames her, and that she now owes him a thousand dollars. Miss Coder has testified

that she didn't take it and that she only . . . gave him the money because she was afraid, and that she had been confined against her will. Now – So this is a disputed debt. Mr. Woods says you owe me a thousand dollars. Miss Coder says, no I don't.

This is different than larceny from a person. And I've racked my brain over this and I do not see that this is larceny from a person.

. . .

I don't see this here as an underlying offense of larceny from a person. And in that case, the asportation element is different in kidnapping where there is no underlying offense. Because, any asportation, just forcible movement from one place to the other, is sufficient for a kidnapping charge where there's no underlying crime, because there isn't anything incidental.

(Tr. III, 156-57.)

Petitioner argues that he was deprived of due process when the jury was not instructed to find that the asportation must be more than that required to commit the underlying offense of larceny from a person. Typically, a claim that a trial court gave an improper jury instruction is not cognizable on habeas review. Instead, Petitioner must show that the erroneous instruction "so infected the entire trial that the resulting conviction violates due process." *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977). *See also Estelle*, 502 U.S. at 75 (erroneous jury instructions may not serve as the basis for habeas relief unless they have "so infused the trial with unfairness as to deny due process of law"); *Sanders*, 221 F.3d at 860 (same). If Petitioner fails to meet this burden, he fails to show that the jury instructions were contrary to federal law. *Id.*

Petitioner fails to demonstrate the sort of fundamental unfairness that would implicate due process. The Michigan courts never have held that a kidnaping requires an underlying offense. Both the standard jury instructions and the Michigan Court of Appeals have recognized that an underlying offense is not required. *See* MICH. CRIM. STAND. JURY INSTR. 2D 19.2; *People v. Lewis*,

No. 254803, 2005 WL 1123619, at *1 (Mich. Ct. App. May 12, 2005) (rejecting defendant's argument that the court was required to instruct the jury to find that the asportation was not merely incidental to the crimes of carjacking and unarmed robbery, because neither of those offenses required asportation of a victim). Further, the Michigan courts have recognized that the failure to give such an instruction is not reversible error where the evidence is such that no reasonable juror could have concluded that the movement was merely incidental to the underlying offense. *See id.*; *see also People v. Medawar*, No. 205433, 1999 WL 33446674, at *3-4 (Mich. Ct. App. Apr. 20, 1999).

Here, notwithstanding Petitioner's arguments, no underlying offense was charged or clearly applicable. Even assuming that a larceny from a person could have been charged, that offense does not inherently require movement of the victim. The elements of larceny from a person, MICH. COMP. LAWS § 750.357, include the intentional taking and carrying away the personal property of another without his consent. *See People v. Ainsworth*, 495 N.W.2d 177, 178 (Mich. Ct. App. 1992). This crime does not require any movement or confinement of the victim. *Cf. Lewis*, 2005 WL 1123619, at *1 (holding that neither carjacking nor unarmed robbery require asportation). Moreover, if there was a larceny from a person, that offense was completed when Petitioner took the money Coder was carrying, before he forced her into the car to transport her to various locations. For all these reasons, Petitioner was not deprived of a fundamentally fair trial by the jury instructions.

Petitioner also vaguely argues that the jury instructions, as given, deprived him of his right to present a defense. In support of his claim, he cites *Washington v. Texas*, 388 U.S. 14 (1967). In *Washington*, the Supreme Court considered "whether the right of a defendant in a

criminal case under the Sixth Amendment to have compulsory process for obtaining witnesses in his favor is applicable to the States through the Fourteenth Amendment." *Id.* at 14. The Court concluded that it did. *Id.* at 23. The fact that the Due Process Clause entitles a defendant to put witnesses on the stand and to have access to compulsory process does not support Petitioner's contention that he had the right to a particular jury instruction. As previously discussed, a court on habeas review may grant relief on an erroneous jury instruction only if the instruction rendered his criminal trial fundamentally unfair. *Henderson*, 431 U.S. at 155. Where, as here, the evidence clearly demonstrated that Brandi Coder was forced to move back and forth over substantial distances and across state lines, no reasonable juror could have found asportation to be merely incidental. As a consequence, Petitioner fails to demonstrate fundamental unfairness in the jury instructions. The decisions of the Michigan Court of Appeals and the Michigan Supreme Court to deny the claim were not unreasonable applications of established United States Supreme Court precedent.

III.  Prosecutorial Misconduct

Petitioner argues that the prosecutor denied him his rights to a fair trial and due process by several actions. First, he contends that the prosecutor introduced irrelevant and prejudicial information by introducing the recorded statement made by Mike Underwood. Second, he asserts that the prosecutor denigrated the defense. Finally, Petitioner claims that the prosecutor argued facts not in evidence. Petitioner argues that, whether taken together or separately, the prosecutor's actions rise to the level of a due process violation.

In order for a petitioner to be entitled to habeas relief on the basis of prosecutorial misconduct, the petitioner must demonstrate that the prosecutor's improper conduct "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v.*

*Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  In evaluating the impact of the prosecutor's misconduct, a court must consider the extent to which the claimed misconduct tended to mislead the jury or prejudice the petitioner, whether it was isolated or extensive, and whether the claimed misconduct was deliberate or accidental.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985).  The court also must consider the strength of the overall proof establishing guilt, whether the conduct was objected to by counsel and whether a curative instruction was given by the court.  *See id.* at 12-13 (1985); *Darden*, 477 U.S. at 181-82; *Donnelly*, 416 U.S. at 646-47; *Berger v. United States*, 295 U.S. 78, 84-85 (1935).

To the extent that Petitioner argues that the introduction of Mike Underwood's recorded statement was improper, his claim essentially tracks his argument in Ground II that the trial court improperly admitted it.  As I previously have discussed, the limited use of Mike Underwood's statement was neither improper nor fundamentally unfair.

Petitioner next contends that the prosecutor improperly denigrated his defense.  Specifically, he references the prosecutor's response to a defense objection to Brandi Coder's testimony:

> [PROSECUTOR]:  Judge, where [sic] at a point here where other wise [sic] were [sic] hiding things from this Jury.  This is the essence of what this entire issue is all about, and what we believe the theory and the evidence will show, is what the defendant was going after this victim for.

(Tr. I, 196.)  While a prosecutor may not make unfounded or inflammatory attacks on opposing counsel, *see United States v. Young*, 470 U.S. 1, 9 (1985), the cited statement did not constitute such

an attack. The statement was a passing comment made in response to an objection and did not explicitly reference the defense. Instead, the prosecutor indicated that all parties were responsible for not keeping important information from the jury. The statement clearly did not implicate fundamental fairness. Moreover, the defense raised no objection to the comment. Further, the court clearly instructed the jury that the attorneys' statements were not evidence. (Tr. III, 239.) For all these reasons, the comment did not amount to prosecutorial misconduct and did not deprive Petitioner of a fundamentally fair trial.

Petitioner next complains about two remarks made by the prosecutor on rebuttal. At the outset, it should be noted that improper prosecutorial remarks made during rebuttal argument are generally of limited impact and are unlikely to rise to the level of prosecutorial misconduct. *See Angel v. Overberg*, 682 F.2d 605, 608 (6th Cir. 1982).

Petitioner first complains about the following statement:

> Now, the Defense has said this is not a drug case, this is not an assault case. We haven't charged him with assault. We haven't charged him with possession of drugs. The defendant is the one – the Defense attorney, who's talked about him being a violent reputed drug dealer, those were his exact words. I have never said that. I'm not here to prove that. I don't care about that. If you come to the conclusion based on this evidence, then that's the conclusion you draw. I'm trying to prove kidnapping.

(Tr. III, 233-34.) Petitioner argues that the prosecutor mischaracterized defense counsel's statement and called Petitioner a "violent repeated drug dealer." Contrary to Petitioner's characterization, the prosecutor at no time suggested that Petitioner was guilty of being a "violent *repeated* drug dealer," and the prosecutor did not indicate that defense counsel had made such a claim. Although the prosecutor did not quote defense counsel entirely accurately, because defense counsel did not use the word "violent," the small difference between the remarks could not have significantly misled the

jury.  (Tr. III, 228.)  To the contrary, the prosecutor squarely indicated that it was not his intent or

his duty to prove such a charge.  Moreover, the jury had the opportunity to hear and remember what

defense counsel said and what the witnesses testified.  As the court instructed, the remarks of the

attorneys are not evidence, and it is the jury's job to reject any lawyer's statement that is unsupported

by the evidence.  (Tr. III, 239.)  This fleeting comment was not prejudicial.

      In his second complaint about the prosecutor's rebuttal argument, Petitioner argues

that the prosecutor improperly accused defense counsel of stating that Brandi Coder never said she

was scared of Petitioner.  In fact, the prosecutor said something slightly different:

> The defendant – Defense counsel said one thing in his closing that I
> absolutely object to.  I didn't object because we try very hard not to object to each
> other['s] closing arguments.  He said that Brandi said she was never scared of him.
> That is not true.  She said she was scared of him.  And if you forget – if you disregard
> what I had to say or what Mr. Sible has to say, you saw her crying.

(Tr. III, 235.)  Petitioner is correct in saying that defense counsel did not make the precise remark

the prosecutor claimed, though counsel did state that Coder was not scared because of anything

Petitioner might have said or done.  The jury had the opportunity to hear and remember what actually

was said and to determine how it corresponded with the evidence.  In light of the court's clear

instructions on the treatment of statements by the lawyers, the prosecutor's misstatement of defense

counsel's argument did not constitute misconduct.

      Petitioner next claims that the prosecutor argued facts not in evidence, and he lists

a series of statements made during closing argument with which he disagrees:  that the defense was

trying to hide things from the jury (Tr. I, 196); that Petitioner went into the house to avoid the police

(Tr. III, 209); that Petitioner was part of the group surrounding Coder (Tr. III, 211); that Stacey Clark

had to finish writing the check because Coder was too upset (Tr. III, 215); that Petitioner knew that

Coder had more money than Yaearla Davis (Tr. III, 218); that Clark saw Coder crying (Tr. III, 220); and that Coder felt that she would be assaulted in the not too distant future if she did not comply (Tr. III, 222). Although Petitioner himself has not accurately characterized all of the prosecutor's comments, none of those comments were improper. I previously have discussed Petitioner's claim that the prosecutor accused defense counsel of trying to hide things from the jury. Petitioner's remaining objections are meritless. Contrary to what Petitioner claims, the prosecutor's remarks were all reasonable commentaries on the evidence or reasonable inferences from that evidence. *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). None of the remarks were improper, much less fundamentally unfair.

In sum, whether considered separately or together, Petitioner's claims of prosecutorial misconduct fall far short of demonstrating the sort of extreme prosecutorial misconduct that would implicate due process. *See Angel*, 682 F.2d at 609.

IV.     Ineffective Assistance of Counsel

In his final ground, Petitioner raises the ineffective assistance of counsel. Petitioner does not argue any independent inadequacies in his attorney's representation. Instead, he asks that, should the Court decline to consider a claim because counsel failed to object, the ineffectiveness of counsel be considered cause excusing the procedural default. Because I have addressed each of the claims on its merits, notwithstanding any lack of objection, Petitioner's final habeas claim is moot.

**Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Dated:   June 15, 2010                          /s/  Joseph G. Scoville
                                                United States Magistrate Judge

**<u>NOTICE TO PARTIES</u>**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).